[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 15, 2007
THOMAS K. KAHN
CLERK

No. 06-14406

_____

D. C. Docket No. 05-00425 CV-T-30-MSS

CHARLES FRANK MACK,

Plaintiff-Appellant,

versus

METROPOLITAN LIFE INSURANCE COMPANY,
a foreign corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(June 15, 2007)**

Before BIRCH, FAY and CUDAHY,* Circuit Judges

---

*Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit, sitting by designation.

PER CURIAM:

Charles Frank Mack is a troubled man. He suffered severe abuse while institutionalized in his childhood and is now full of tension and anger, beset by violent impulses and disturbing thoughts. One psychiatrist diagnosed him with Bipolar Affective Disorder, Post Traumatic Stress Disorder (PTSD), Antisocial Personality Disorder and Depression. To make matters worse, he is an alcoholic. At one point, he was ingesting over thirty alcoholic drinks per day. While working as a salesman for a car dealership in 2003 he applied for and received short-term disability benefits for alcoholism and PTSD from an employee benefit plan administered by the defendant, Metropolitan Life Insurance Co. (MetLife). On April 18, 2004, however, MetLife stopped Mack's benefits, finding that he was able to work and was not undergoing appropriate treatment for his alcoholism. Mack filed an unsuccessful administrative appeal and then brought this action against MetLife under Employee Retirement Income Security Act § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) (ERISA), "to recover benefits due to him under the terms of his plan." The district court granted summary judgment to MetLife. Mack appeals; we affirm.

The parties dispute the appropriate standard of review. Mack argues, sensibly enough, that summary judgment against him is appropriate only if the

record evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Shaw v. Conn. Gen. Life Ins. Co.*, 353 F.3d 1276, 1282 (11th Cir. 2003); *Brown v. Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1559 (11th Cir. 1990).  MetLife contends that although the district court explicitly granted MetLife's motion for "summary judgment" (as opposed to its motion in the alternative for a Rule 52 judgment on the administrative record, which was also before the district court), this court should treat the district court's Rule 56 judgment as a Rule 52 judgment, so that the district court's factual findings stand unless clearly erroneous.  Fed. R. Civ. P. 52(a).  This position has some practical attraction because there is no right to a jury trial on ERISA claims, *Shaw*, 353 F.3d at 1286 (11th Cir. 2003); *Stewart v. KHD Deutz of Am. Corp.*, 75 F.3d 1522, 1527 (11th Cir. 1996), and because when a plan grants its administrator discretionary authority to interpret it (which the parties agree is the case here) the parties may not generally introduce new evidence of disability in the district court, so that the case must be decided on the administrative record, *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1326 (11th Cir. 2001); *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989).  Because the standard for judgment at trial is less demanding than the standard for summary judgment, a

judge who mistakenly grants summary judgment to one party in such a situation would likely also grant that party a Rule 52 judgment, making a remand's outcome predictable and the remand itself arguably unnecessary. *Crume v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2005); *Liston v. Unum Corp. Officer Severance Plan*, 330 F.3d 19, 24 (1st Cir. 2003); *see also Patton v. MFS/Sun Life Fin. Distributors, Inc.*, 480 F.3d 478, 484 (7th Cir. 2007) (discussing harmless error in this context). The First and Ninth Circuits have adopted MetLife's proposed construction of ERISA "summary judgment" motions. *Bard v. Boston Shipping Ass'n.*, 471 F.3d 229, 235 (1st Cir. 2006); *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

The positions taken respectively by the parties would be in their respective interests from an *ex post* perspective; given that some sort of judgment has been granted under some rule, Mack would prefer Rule 56 and MetLife would prefer Rule 52. But we wonder if the parties have considered how their different versions of ERISA "summary judgment" would operate in future litigation. Mack claims that the majority of summary judgment motions in ERISA cases are filed by plan administrators and describes the high standards for a grant of summary judgment as "procedural safeguards which protect the ERISA litigant" (Appellant's Reply Br. at 4), but summary judgment is a tool that potentially

4

benefits *the movant*.  That is why so many parties move for summary judgment rather than barrel straight into trial.  A summary judgment motion terminates the litigation if successful, and if unsuccessful gives the movant a sneak peek at the opposing party's theory of the case and litigation strategy before facing a final decision.  Despite these benefits MetLife argues basically that summary judgment should not exist in a good portion of ERISA cases, and that if a party moves for summary judgment the trial court should treat it instead as a motion for judgment on the record.  But does MetLife really want to lose the exploratory benefits of summary judgment in all such future cases?

We do not need to address this issue in the present case.  Summary judgment is normally appropriate where no genuine issue of material fact exists, and such an issue exists only where a reasonable fact finder could find in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Slomcenski v. Citibank, N.A.*, 432 F.3d 1271, 1277 (11th Cir. 2005).  In the present case no one could reasonably find Mack entitled to benefits under the plan, and so summary judgment was proper even under Mack's proposed standard of review. (Because we conclude on *de novo* review, without deferring to MetLife's reasoning or findings, that its benefits determination must have been correct, we also need not discuss the complex apparatus of arbitrary and capricious review.

*See Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1231-32 (11th Cir. 2006).)

A participant in MetLife's plan is entitled to short-term disability benefits if he is disabled. A participant is disabled if

> due to sickness, pregnancy or accidental injury you:
> (1) are receiving Appropriate Care and Treatment from a doctor on a continuing basis; and
> (2) are unable to earn more than 80% of your Predisability earnings at your Own Occupation for any employer in your Local Economy.
> (STD Certificate at 14-15.)

The parties dispute whether Mack satisfied either criterion; we discuss only the first. Neither party explains the meaning of "Appropriate Care and Treatment" (even though MetLife's plan offers a definition of the phrase that both parties largely ignore), but both regard it to mean something like, "all treatment one should reasonably undergo in order to become well." That expresses some aspects of the definition well enough,[1] and captures the provision's undoubted purpose:

---

[1]MetLife's plan defines "Appropriate Care and Treatment" to mean treatment that satisfies five criteria:

> 1. it is received from a Doctor whose medical training and clinical experience are suitable for treating your Disability;
> 2. it is necessary to meet your basic health needs and is of demonstrable medical value;
> 3. it is consistent in type, frequency and duration of treatment with relevant guidelines of national medical, research and health care coverage organizations and governmental agencies;

MetLife wants its claimants to get well as soon as possible so it can stop paying them benefits, and it therefore requires them to undergo the treatment most likely, under all the circumstances, to get them healthy.

MetLife argues that summary judgment is proper in light of its expert Dr. Ian Lipsitch's opinion that "[a]ppropriate treatment for alcoholism unequivocally includes abstinence and the claimant has repeatedly avoided becoming abstinent." (AR 103.) Mack contends that it is simplistic to assert that treatment for alcoholism "unequivocally includes abstinence." MetLife agrees that alcoholism is a "sickness" rather than simply a habit or disposition. *See* James E. Royce, *Alcohol Problems and Alcoholism: A Comprehensive Survey* ch. 7 (rev. ed. 1989). The purpose of treatment for this sickness is to induce the alcohol addict to cease feeding his addiction–in simple terms to stop drinking. But steadfast abstinence may be beyond the powers of the addict at the onset of treatment–even though it remains the goal, and, in fact, is the sure indicator of successful treatment. Because the purpose of the policy's "appropriate treatment" requirement is to encourage claimants to undertake measures to restore their health, it cannot

---

4. it is consistent with the diagnosis of your condition; and
5. its purpose is maximizing your medical improvement. (STD Certificate at 15.)

The meaning that the parties assign to the term is fairly well reflected in criteria four and five.

7

reasonably be construed as requiring success (abstinence) at the outset but only as undertaking treatment which focuses on abstinence as an immediate and continuing goal.

But although an alcoholic may not be able to stop drinking, he is able to *try* to stop drinking by taking steps that will weaken the disease's hold on him. *Id.* at 121 ("[T]he relation between habit and free choice is very complex and subtle, and we need a balance between powerlessness over being alcoholic and responsibility for what we can do about it."). It is obvious from context that *this* is what Lipsitch meant. According to him, Mack's problem was not simply that he was not abstinent, but that he had "repeatedly avoided becoming abstinent" by adopting a weak treatment regimen that lacked "a chance of being effective." (AR 103.) The patient's treatment does not necessarily have to be successful, but the patient *does* have to get whatever sort of treatment is called for under the circumstances to fight the illness as effectively as the patient reasonably can.

The record indicates that Mack did not undergo several doctor-recommended treatments for his alcoholism. MetLife stopped paying Mack benefits as of April 18, 2004 (though it considered his claim through August 1, 2004, when it officially denied benefits). In notes from a March 23, 2004 meeting between Mack and his mental health and addiction counselor Ben Vyzas, Vyzas

8

indicated that Mack was "upset" by his psychiatrist Dr. Sheehan's "suggestions re. abstinence." He refused to use the alcoholism drug Antabuse because of stomach problems; he refused to dry out in an inpatient detox program because he "c[ould]n't stand locked doors" (apparently because of the abuse he suffered while institutionalized as a child); he refused to attend Alcoholics Anonymous meetings because he could not "see [him]self talking to a group." Vyzas described Mack as "not ready to stop" and "not comfortable w/goal of abstinence." (AR 124.) By June 18, two months after benefits had been cut off, Mack had significantly reduced his alcohol intake (from an astounding thirty to a still very high ten drinks a day), but apparently had still not taken any of the actions suggested by Sheehan and Vyzas.[2]

Mack admits that he did not follow their advice, but insists it was bad advice. He claims that because of his PTSD and other psychological and physical conditions, he could not safely endure the treatments that would offer him the best

---

[2]Mack contends that he entered some sort of outpatient alcohol treatment program at some point in June, pointing to a brief note in MetLife's computer system indicating that to be the case. (AR 10.) Assuming that is true (the note is unexplained and contradicted by other record evidence, such as a letter from Mack requesting in late June that MetLife refer him to an outpatient program, see AR 100), it did not match his doctors' advice (Sheehan had recommended an inpatient program, see AR 74, 124) and came too late to save his claim. MetLife requires treatment on a "continuing basis," and, as the district court found, that certainly does not include treatment begun after an unjustified delay, after benefits have already been discontinued.

chance of becoming sober, and that consequently the only reasonable treatment for him was to see a psychiatrist and counselor.  This argument is not inherently implausible.  It is theoretically possible that, for instance, Mack's temporary confinement in an inpatient detox program might pose a risk of psychological harm that would outweigh the chance of benefits in his struggle against alcoholism.

But to defeat summary judgment Mack must offer *evidence* from which a jury could reasonably believe his arguments, and an argument resting on psychology and medicine requires the testimony of an expert witness qualified in those fields.  *See* Fed. R. Evid. 701 & 702; *Colsa Corp. v. Martin Marietta Servs., Inc.*, 133 F.3d 853, 855 n.4 (11th Cir. 1998).  Mack offers no such evidence to support his claims.  For instance, Mack suffers from Barrett's Esophagus, a throat condition that is associated with, though not definitively caused by, acid reflux disease and that is, rarely, precancerous (*see generally* Nat. Inst. of Diabetes & Digestive & Kidney Diseases, *Barrett's Esophagus* (2004), *available at* http://digestive.niddk.nih.gov/ddiseases/pubs/barretts/index.htm); he claims that this prevents him from using the drug Antabuse, which discourages drinking by interacting with alcohol to produce effects similar to a massive hangover, which can include vomiting.  But we are aware of no evidence that the risk of vomiting

10

posed by Antabuse would outweigh the potential benefit of reduced alcohol consumption offered by the drug (especially since excessive alcohol consumption itself might pose a risk of vomiting). In fact, the record contains no evidence at all on the nature of Barrett's Esophagus or Antabuse. (The record reflects that Mack told Vyzas he couldn't use Antabuse because it induced vomiting, but Mack is not a doctor, and neither is his attorney, who repeats Mack's assertions in his brief.)

Similarly, Mack claims that an inpatient detox program would be "inappropriate given [his] traumatic history" of childhood abuse (Appellant's Initial Br. at 26), but there is again nothing but Mack's own assertion to support the claim. Mack told a hired expert, Dr. George Northup, that Mack himself thought that he "would not be able to tolerate a locked facility" and "would likely assault someone" in such an institution. (AR 176.) But Mack is not a psychologist, and while Northup acknowledged Mack's fears (*see* AR 177 ("He believes he will not tolerate an inpatient type program. Whether or not he would be able to tolerate a residential treatment program is questionable, as well.")), he did not agree that Mack could not or should not enter into an inpatient program. Indeed, he stated that "[a] more intensive program regarding sobriety would give him a better chance for relief from psychiatric symptoms and return to work, as

11

well." (AR 177.) And finally, there is no explanation at all why Mack could not attend AA or similar meetings beyond his personal aversion to them.

We do not mean to belittle Mack's problems. It may well not be easy for him to undergo any of the treatments suggested. But neither is it easy to live with the conditions he faced in 2004 and may, for all the record reveals, still face today.[3] All the medical evidence in this case suggests that Mack could best serve his own mental and physical health by following his doctors' advice. Because the evidence on that point is unanimous, any reasonable factfinder would have to conclude that Mack's psychiatric treatment was not, by itself, appropriate care and treatment within the meaning of MetLife's benefits plan.

For the foregoing reasons, we **affirm** the judgment of the district court.

---

[3]Mack has requested long-term disability benefits in his complaint (which we cannot grant–he never requested long-term benefits under the plan and was therefore not entitled to them under ERISA § 502(a)(1)(B)).